**FOLD-PAK CORPORATION, Plaintiff,**

**v.**

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

**No. CIV-90-572S.**

United States District Court, W.D. New York.

Feb. 7, 1992.

William G. Todd, William A. Alper, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff.

Sheldon Hurwitz, Hurwitz & Fine, P.C., Buffalo, N.Y., for defendant.

DECISION AND ORDER

SKRETNY, District Judge.

Defendant Liberty Mutual Fire Insurance Company has moved for summary judgment, or in the alternative, for partial summary judgment, and for an order compelling plaintiff to produce certain documentation. Plaintiff Fold–Pak Corporation has moved for partial summary judgment.

In support of its motion, defendant submits a memorandum of law with exhibits ("Defendant's memo"); a supplemental memorandum of law with exhibits ("Defendant's second memo"); the affidavit of Sheldon Hurwitz with exhibits, sworn to on January 9, 1991 ("Hurwitz aff."); a supplemental reply affidavit of Sheldon Hurwitz, sworn to on February 28, 1991 ("Second Hurwitz aff."); and the affidavit of Karin Harbour, sworn to on January 8, 1991 ("Harbour aff.").

In opposition to defendant's motions and in support of its own motion plaintiff submits a memorandum of law ("Plaintiff's memo"); a reply memorandum of law ("Plaintiff's second memo"); the affidavit of William Alper, sworn to on February 6, 1991 ("Alper aff."); the affidavit of Karl DeMay, sworn to on February 8, 1991 ("DeMay aff."); and the affidavit of Jack Slawson, sworn to on February 8, 1991 ("Slawson aff.").

I also heard oral argument on the motions on March 7, 1991.

For the reasons discussed below, defendant's motion for summary judgment is denied. Defendant's motion for partial summary judgment is granted. Plaintiff's motion for partial summary judgment is granted in part and denied in part. Defendant's motion to compel production is granted.

FACTS

This dispute concerns the interpretation of an insurance policy. Jurisdiction is predicated on diversity.

Plaintiff manufactures and sells various types of folding food containers. Approximately one-half of its business is the sale of so-called "food pails" typically used in Chinese restaurants to package takeout food. (DeMay aff., ¶ 2).

On August 1, 1988, defendant issued plaintiff a "Comprehensive Business Property Policy" (the "Policy") for 1989. The Policy contains a "Loss of Income Endorsement" (the "Endorsement"), which both parties agree governs the propriety of plaintiff's claims for lost income and expenses. A copy of the entire Policy, including the Endorsement, is attached as Exhibit D to the Hurwitz affidavit. The Endorsement extends the coverage of the Policy to include "... LOSS OF INCOME, during the period of recovery ... directly resulting from necessary interruption of the insured's operations ... caused by physical damage to real or personal property by a peril insured against."

On April 9, 1989, plaintiff experienced a fire at its Newark, New York plant. (DeMay aff., ¶ 4). This fire destroyed certain flexology equipment (the "Flexo machine"), which plaintiff used to manufacture food pails. As a result, plaintiff had to use a more expensive process to make food pails. This process is called the "litho" process. (Exhibit F to Hurwitz aff., Section 11 B). Defendant compensated plaintiff for the loss of the Flexo machine, and advanced it $250,000.00 towards its claimed losses recoverable under the Endorsement. (Exhibit H to Hurwitz aff.).

In December 1989 plaintiff submitted a claim to defendant for $4,081,471.00, which it claimed was recoverable as Business In-

terruption under the Endorsement.[1] Of this amount, plaintiff designated $1,479,-940.00 as "Loss of Production" and $2,601,-531.00 as "Extra Expenses." The "Extra Expense" claim consists of $2,077,984.00 in "Increased Cost of Production," $200,-250.00 in "Management Expediting Expenses" and various other extra expenses. Defendant did not pay these full amounts. In June 1990, plaintiff commenced this lawsuit, alleging that defendant breached the Policy because it did not pay plaintiff's full claim under the Endorsement. The complaint seeks damages of no less than $4,000,000.00. (Complaint, ¶ 10).

In its answer to plaintiff's complaint, defendant asserts four affirmative defenses, two of which are relevant to the instant motions. The second defense alleges that plaintiff misrepresented the extent of its loss and, therefore, under paragraph 18 of the Policy, the Policy is void. (Answer, ¶¶ 9–12). The third defense alleges that plaintiff is not entitled to recovery because it failed to cooperate with defendant in violation of paragraph 13 of the Policy. (Answer, ¶¶ 13–15).

*The Instant Motions*

Defendant seeks summary judgment dismissing the complaint in its entirety based on both its second and third affirmative defenses. In the alternative, defendant seeks partial summary judgment striking plaintiff's "Loss of Production" claim in its entirety, limiting plaintiff's "Extra Expense" claim to the actual increased cost of production excluding normal operating expenses that did not reduce the loss, striking plaintiff's claim for management expediting expenses, and reducing plaintiff's claim for waste by the amount of income (not yet determined) plaintiff received from its sale of waste. Defendant further seeks an order compelling plaintiff to produce certain documentation.

Plaintiff cross-moves for partial summary judgment striking defendant's second and third affirmative defenses. As to the second defense, plaintiff argues that defendant has not produced sufficient evidence to show by clear and convincing evidence that plaintiff misrepresented the extent of its loss. As to the third defense, plaintiff contends it has complied with the defendants requests, and produced thousands of documents. Further, plaintiff opposes defendant's alternative motion for partial summary judgment, arguing that genuine issues of material fact exist regarding the amount it may recover on its claims under the Endorsement.

DISCUSSION

Fed.R.Civ.P. 56(c) mandates summary judgment when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Where the defendant moves for summary judgment, the plaintiff must make a sufficient showing of each essential element of its case, on which it bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A sufficient showing of an essential element means a showing upon which a reasonable jury could find for the plaintiff. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A summary judgment motion will not be defeated merely on the basis of conjecture or surmise. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2nd Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). Courts should not be reluctant to grant summary judgment in appropriate cases because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims" *Celotex Corp. v. Catrett,* 477 U.S. at 323–324, 106 S.Ct. at 2553, thereby permitting courts to avoid "... protracted, expensive and harassing trials." *Meiri v. Dacon,* 759 F.2d 989, 998 (2nd Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

1. Plaintiff also claimed $574,034 for equipment loss, which amount is not at issue in this lawsuit.

I. *Defendant's Motion for Partial Summary Judgment*

a. Loss of Production Claim

Plaintiff seeks to recover $1,479,940 under the Endorsement as "Loss of Production." Plaintiff arrives at this figure by estimating that, but for the fire, it would have produced 274,444,000 food pails at its Newark plant between April 10, 1989 and January 15, 1990. This is 35 percent more food pails than it produced during that same period in 1988 and 1989.[2] Plaintiff then subtracts from this number the number of food pails it actually *did* produce at Newark between April 10, 1989 and January 15, 1990: 189,876,000. Thus, plaintiff estimates that the fire prevented it from producing 84,568,000 more pails than it actually produced during the relevant period. If plaintiff sold those additional pails at $70.00 per 1000 pails, it would have brought in $5,919,760.00. If plaintiff realized a 25 percent profit on that amount, its income on the lost pails would have been $1,479,940.00. Accordingly, plaintiff seeks to recover all these profits pursuant to ¶ B.1 of the Endorsement which states, in relevant part:

> In determining LOSS OF INCOME, due consideration shall be given to the experience before the date of the damage or destruction and the probable experience thereafter had no loss occurred.

Despite plaintiff's calculation of lost profits, I find that plaintiff has failed to show that this alleged 84,568,000 pail shortfall, even if it was caused by the fire, caused any loss of income. Plaintiff's president Karl DeMay relates that after the fire occurred and the Flexo machine was destroyed, plaintiff immediately began utilizing the litho process to make food pails. (DeMay aff., ¶ 15). Further, in June 1989, plaintiff installed a used Flexo machine at its Newark facility to replace the machine that was destroyed by the fire (DeMay aff., ¶ 16). Plaintiff used this replacement machine throughout the period of the claim, although it did not operate at peak efficiency (DeMay aff., ¶¶ 16–17). Although there is no dispute that these measures were more expensive, Mr. DeMay admits that plaintiff "... managed to satisfy all food pail orders...." (DeMay aff., ¶ 17).[3] Mr. DeMay also testified at his examination under oath that plaintiff had no difficulty keeping up with the orders it had from its customers:

> Q. Were you meeting the needs of your customers in '89?
>
> A. [Mr. DeMay] Yes.
>
> Q. You don't have any documents to show that you couldn't satisfy the needs of your customers in '89, do you?
>
> A. No.
>
> Q. Then you don't claim, sir—Mr. DeMay, then you don't claim, sir, that you lost any sales to customers as a result of this fire?
>
> A. I'm going to qualify that. We don't claim—to my knowledge, the claim does not tell you that we lost any sales except that we feel that with the conditions, that we maybe could have gotten more.

(Exhibit I to Hurwitz aff., at 125–127).

Likewise, Robert Mullally, plaintiff's vice president of sales and marketing testified:

> Q. If there were customers who were not being shipped the products they ordered, would that come to your attention as marketing manager?
>
> A. [Mr. Mullally] Yes, I think they would have told us.

2. Plaintiff figures in this 35 percent increase because production had increased each year since 1976, and because its Newark plant production in 1989 increased by 32.6 percent over 1987. (DeMay aff., ¶ 13). Plaintiff further justifies this projection in its Proof of Claim (Exhibit F to the Hurwitz aff.) because sales of the product had increased nationwide, and previous competitors were no longer producing pails.

3. The only evidence to the contrary is a report of a customer back order, which, if it was not filled, would have resulted in a $4,270.00 loss of income to plaintiff. (Hurwitz aff., ¶¶ 27–28 and Exhibits N & O). However, Christopher Sweeney, plaintiff's Controller, was unable to testify at his examination under oath whether the customer's order remained unfilled or ultimately was satisfied.

> Q. The fact you don't have any others [back order reports], would that be an indication there were no other customers who needs where not being met?
>
> A. Yes.

(Exhibit J to Hurwitz aff., at 8–9).

Thus, even if plaintiff had produced the pails, nobody was standing in line to buy them. There is no evidence that plaintiff was unable to produce food pails in sufficient quantity to meet its customers' demands. *See Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.,* 360 F.2d 531 (8th Cir.1966) (fire caused production reduction but no loss of sales; no recovery for loss of earnings allowed). Plaintiff's claim is like that of the plaintiff in *Howard Stores Corp. v. Foremost Ins. Co.,* 82 A.D.2d 398, 441 N.Y.S.2d 674, 676 (1st Dep't 1981), *aff'd,* 56 N.Y.2d 991, 453 N.Y.S.2d 682, 439 N.E.2d 397 (1982). There, the court held that the insured had failed to prove a business interruption loss. While recognizing that losses payable under a business interruption policy must be estimated based on the experience of the business, the court held that despite the insured's computations and projections, there was "... simply no evidence that any failure to meet the projected increases was directly attributable to the water damage...." *Id.,* 441 N.Y.S.2d at 676. Likewise, Mr. DeMay's conclusion that "... the fire prevented Fold–Pak from realizing its projected business expansion (probable experience) for 1989, based on demonstrated historical performance" (DeMay aff., ¶ 17) is unsupported by any evidence in the record.

A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial, and summary judgment must be granted as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. Thus, defendant's motion for partial summary judgment is granted as it pertains to plaintiff's "Loss of Production" claim. Accordingly, plaintiff's claim of lost income due to business interruption in the amount of $1,479,940.00 is dismissed.

b. Extra Expenses Claim

Defendant concedes that section B.2 the Endorsement requires it to reimburse plaintiff for the extra expenses it incurred because of the fire for the purpose of reducing its loss of income, and has already advanced plaintiff $250,000.00 to that end. (Hurwitz aff., ¶ 40). Such increased costs include those associated with using the more expensive litho process and the cost of obtaining the used Flexo machine for use at the Newark facility. However, defendant argues that plaintiff's claim also demands as "extra expenses" certain production costs that plaintiff would have expended whether or not the fire had occurred, and defendant refuses to pay those costs. Specifically, defendant claims that plaintiff has exaggerated its claim for increased costs of production by $659,647.00 and that plaintiff's $200,250.00 claim for "management expediting expenses" is not recoverable at all. Accordingly, defendant seeks to have plaintiff's complaint limited to disallow those expenses.

i. *Increased Costs of Production*

■ Plaintiff asserts its extra expense claim under Sections B.1 and B.2 of the Endorsement, which state in relevant part:

> B. BASIS OF LOSS PAYMENT:
>
> 1. The measure of recovery shall be the insured's LOSS OF INCOME during the period of recovery less charges and expenses which do not necessarily continue during interruption of operations, but NOT TO EXCEED THE ACTUAL LOSS SUSTAINED by the Insured resulting therefrom ... In determining LOSS OF INCOME ... [c]onsideration shall also be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations with the same quality of service which existed immediately preceding the loss.
> 2. Coverage applies to such expenses as are necessarily incurred for the purpose of reducing loss of income including expense, in excess of normal, necessarily incurred in replacing finished stock to reduce loss hereunder; not exceeding, however, the amount by

which such loss under this policy is thereby reduced.

Plaintiff is not entitled to recover anything under section B.1 of the Endorsement. That section, by its terms, merely states that continuing normal expenses shall be considered in determining loss of income. However, the section also states that recovery shall not exceed the actual loss sustained. Fortunately for the plaintiff, as discussed above, it did not suffer a loss of income. Therefore, it is not entitled to recover any of its continuing normal expenses under section B.1.

Section B.2 of the Endorsement permits plaintiff to recover "... such expenses as are necessarily incurred for the purpose of reducing loss of income...." It is undisputed that plaintiff incurred additional expenses to keep production at a level sufficient to satisfy customer demand, thereby avoiding any loss of income. However, plaintiff and defendant calculate these additional expenses differently.

In its proof of loss, plaintiff calculates that it cost $20.22 more to produce 1000 food pails by using the litho process than it would have cost by using the Flexo machine. (Proof of Loss, Exhibit F to Hurwitz aff., Section II B). Plaintiff had to use the litho process at Newark to produce 102,765,500 pails. This additional cost, plus the additional amounts expended to obtain and utilize the replacement Flexo machine, make up plaintiff's claim of $2,077,984.00 for its increased costs of production.[4]

Defendant argues, principally through the affidavit of Karin Harbour, a CPA employed by defendant as a senior auditor, that plaintiff's method of calculation does not accurately reflect "... expenses necessarily incurred for the purpose of reducing loss of income." Defendant claims that plaintiff erroneously calculated its increased costs of production by using the "full absorption method" of accounting; plaintiff simply subtracted the full cost of what it would cost to produce 102,765,500 pails using the Flexo machine from the full cost of what it actually did cost plaintiff to produce that same number of pails using the litho process, and claimed the difference as its increased cost of production. Ms. Harbour argues that the proper accounting procedure in determining the increased costs of production is to separate the cost of operations into two categories: fixed costs (costs which remain constant and are incurred regardless of level or method of production, *e.g.*, depreciation on the building, office staff, salaried employees, insurance for the factory) and variable costs (direct costs incurred to produce a particular item, *e.g.*, labor costs, cost of materials). (Harbour aff., ¶¶ 16–17). Defendant argues that only plaintiff's variable costs increased by its shift to the litho process, and therefore, it is only this increase in variable costs that plaintiff is entitled to recover as "expenses as are necessarily incurred for the purpose of reducing loss of income...." Ms. Harbour calculates that the increase in variable costs, and thus the additional expenses incurred by plaintiff for the purposes of reducing loss of income, was at most $448,092.00.

I find that defendant's method of calculation more accurately reflects the expenses incurred by plaintiff to reduce its loss of income. Expenses such as depreciation on the building, insurance, salaries, etc., are expenses that plaintiff would have incurred even had there been no fire. They remain constant regardless of what method plaintiff used to produce pails and plaintiff simply did not incur these expenses for the purpose of reducing its loss of income. The calculations of plaintiff and defendant diverge because plaintiff's full absorption method allocates to the cost of producing pails a portion of fixed costs per labor hour. Thus, because litho by all accounts requires more labor hours than Flexo, the full absorption method adds to the production cost a higher percentage of the fixed

4. Defendant claims that plaintiff stated that this figure was an estimate, and that plaintiff later furnished to defendant a report showing that its actual claim for increased cost of production is $1,561,378.53. (Harbour aff., ¶ 19). Plaintiff has not disputed this. Therefore, I shall consider $1,561,378.53 to be the amount of plaintiff's increased costs of production claim.

costs under litho than it does under Flexo, even though the fixed costs by definition are not affected by method or level of production. (Second Hurwitz aff., ¶¶ 23–35). Thus, separating the costs of operation into fixed costs and variable costs more accurately represents the extent of plaintiff's expenditure incurred to reduce, or in this case to avoid, a loss of income.

Plaintiff argues that "... the policy language makes no distinction between fixed and variable expenses ..." (Alper aff., ¶ 33), and therefore, to use those terms to interpret the Endorsement's language "... would be to contradict the pertinent language the company actually did use." (Plaintiff's memo, at 23). However, use of these terms merely serves to isolate and to calculate accurately those expenses that plaintiff actually incurred to reduce its loss of income. The terms of the Endorsement entitle plaintiff to nothing more. Accordingly, plaintiff's recovery of its increased costs of production shall be measured, as defendant argues, by the amount of the variable costs directly attributable to the use of the litho process.[5]

ii. *Defendant's Request for Documentation Re: Normal Litho Production at Newark and Waste*

Defendant also argues that, according to the testimony of Joseph Monahan, plaintiff's production scheduling manager, plaintiff was already utilizing the litho process to produce some pails at plaintiff's Newark facility at the time of the fire. (Harbour aff., ¶ 26–27). Therefore, the true amount of plaintiff's claim for increased costs of production due to the fire cannot be calculated by considering *all* the litho production at Newark, but rather, should be reduced by the amount plaintiff would have expended for litho production at Newark even if the fire had not occurred. Plaintiff has not disputed that it was engaged in some litho production at Newark before the fire occurred. Therefore, the amount of litho production that would have taken place at Newark had no fire occurred is relevant to the calculation of plaintiff's extra expense claim. However, defendant claims that plaintiff has not provided it with adequate documentation indicating how much litho production would normally have occurred at the Newark plant, and seeks an order compelling plaintiff to do so. Plaintiff claims that it has already produced such documentation. (*See* Exhibit S to Hurwitz aff.).

Defendant also argues that plaintiff included in its increased cost of production claim a certain amount of waste, (Harbour aff., ¶ 34), but did not offset that amount by the income it received from selling any such waste to recycling plants. (Harbour aff., ¶ 36). Defendant seeks an order compelling plaintiff to produce documentation indicating the amount of waste it sold.

I have not examined the documentation provided to defendant by plaintiff to determine whether the documentation requested by defendant has been produced. However, if such documentation regarding normal litho production at Newark and sale of waste exists and plaintiff has not already produced it, it shall do so as set forth in the Order below. Otherwise, plaintiff shall be precluded from using at trial, for the purpose of rebutting defendant's calculation of the amount of normal litho production at the Newark plant or the amount of waste sold by plaintiff, any documents responsive to defendant's requests that it has not produced.

Further, defendant's motion for partial summary judgment reducing plaintiff's claim for waste by the amount of income plaintiff received from the sale of such waste is granted. Defendant shall be required to show at trial the amount of income plaintiff allegedly received from the sale of waste.

iii. *Management Expediting Expenses*

Defendant also takes issue with plaintiff's claim for "Management Expedit-

5. Although, as noted above, Ms. Harbour calculates this amount to be no more than $448,-092.00, plaintiff's accountant has not had the opportunity to calculate plaintiff's damages utilizing defendant's accounting procedure. Therefore, I shall not make a finding at this time as to the amount that plaintiff is entitled to recover on its increased cost of production claim, but will leave that calculation to the experts.

ing Expenses" of $200,250.00, as set forth at Section II–I of plaintiff's Proof of Loss. (Exhibit F to Hurwitz aff.). Plaintiff claims this amount because "various individuals at Foldpack [sic] were required to divert from their normal activities in order to provide for the proper development and implementation of a plan." (Exhibit F, at section II–I). Defendant argues that this $200,250.00 portion of plaintiff's claim should be stricken in its entirety because there is no evidence that plaintiff actually expended these additional amounts. Plaintiff does not respond to this argument.

Mr. DeMay testified that neither his salary nor that of Christopher Sweeney, plaintiff's Corporate Controller, increased as a result of the fire. (Hurwitz aff., ¶ 57 and Exhibit I). Further, Mr. DeMay testified that the $200,250.00 "... were all continuing salary expenses." (*Id.*). Plaintiff offers nothing to rebut these statements. Therefore, I find that plaintiff has not produced any evidence that it expended $200,250.00 in so-called "Management Expediting Expenses" for the purpose of reducing its loss of income. Accordingly, defendant's motion to strike that amount from plaintiff's extra expense claim is granted.

II. *Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment*

a. Defendant's Second Affirmative Defense

Defendant moves for summary judgment on its second affirmative defense, which alleges that plaintiff misrepresented the extent of its claim. Plaintiff opposes defendants motion and cross-moves for summary judgment dismissing the second affirmative defense.

Paragraph 18 of the Policy states:

18. Misrepresentation and Fraud: This entire policy shall be void if the Insured has concealed or misrepresented in writing, or otherwise, any material facts or circumstances concerning this insurance or the subject thereof, or if the Insured shall make any attempt to defraud the Company either before or after the loss.

Defendant argues that the Policy is void and the complaint must be dismissed because plaintiff intentionally misrepresented three matters: (i) the status of a competitor; (ii) the amount of its lost income claim; and (iii) the amount of its extra expense claim.

█ To prove fraudulent misrepresentation under New York law, defendant must show that plaintiff misrepresented its loss, and that these misrepresentations were intentionally false, relevant, and material. *Kaffalos, Inc. v. Excelsior Ins. Co. of New York,* 105 A.D.2d 957, 482 N.Y.S.2d 96, 98 (3d Dep't 1984); New York Insurance Law § 3404(e) (McKinney 1985). Defendant must make this showing by clear and convincing evidence. *Ausch v. St. Paul Fire & Marine Ins. Co.,* 125 A.D.2d 43, 511 N.Y.S.2d 919, 922 (2d Dep't), *appeal denied,* 70 N.Y.2d 610, 522 N.Y.S.2d 110, 516 N.E.2d 1223 (1987).

The alleged misrepresentations enumerated above, if made, are material and relevant. However, because the element of intent is notoriously inappropriate for summary judgment, *National Union Fire Ins. Co. of Pittsburgh v. Turtur,* 892 F.2d 199, 205 (2nd Cir.1989), and for the reasons more fully articulated below, defendant's motion for summary judgment on its second affirmative defense is denied. Likewise, because material issues of fact exist as to whether plaintiff intentionally misrepresented the amount of its claim, plaintiff's motion for partial summary judgment dismissing defendant's second affirmative defense is also denied.

i. *The competitor's status*

█ In its Proof of Loss, plaintiff justified its projection of a 35 percent sales increase over 1988 in part by representing that:

> Previous competitors are no longer producing pails. A primary reason they went bankrupt was because they under priced their product. When they left the market place the insured's market share grew substantially and pricing increased without a corresponding increase in cost.

(Exhibit F to Hurwitz aff., Section II–A, at 1). In his examination under oath, Mr. DeMay identified this previous competitor as Fonda Corporation, one of plaintiff's four competitors in the food pail market. (Exhibit I to Hurwitz aff., at 65–67). Defendant argues that the above-quoted representation was false because "... Fonda Corporation did not go out of business and was in fact producing pails and was a viable competitor." (Defendant's second memo, at 2). However, the statements of Mr. DeMay and Mr. Mullally as to Fonda's competitive status during the relevant period demonstrate that a question of fact exists as to whether plaintiff intentionally misrepresented Fonda's status.

Mr. Mullally testified that Fonda's financial trouble in 1988 was a contributing factor to plaintiff's increase in production in 1988 of 35 percent over 1987, that he thought that "Fonda was still having problems" in 1989 and that Fonda was not viable again until late 1989 or 1990. (Exhibit J to Hurwitz aff., at 5–7). However, Mr. DeMay testified that Fonda did not go out of business and was a competitor throughout 1989. (Exhibit I to Hurwitz aff., at 65–67). Thus, Mr. Mullally's assessment of Fonda's viability conflicts with Mr. DeMay's. This does not show by clear and convincing evidence that plaintiff intentionally misrepresented Fonda's competitive status. Rather, it raises a question of fact as to plaintiff's knowledge of Fonda's competitive status. Keeping in mind that on a motion for summary judgment a court must draw all reasonable inferences in favor of the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), defendant has not shown by clear and convincing evidence that plaintiff intentionally misrepresented Fonda's status.

ii. *The amount of the Loss of Income claim*

Defendant further argues that plaintiff's loss of income claim was so grossly disproportionate to its actual loss that, as a matter of law, plaintiff intended to misstate its loss. (Defendant's second memo, at 4). In support of this argument, defendant cites *Saks & Co. v. Continental Ins. Co.*, 23 N.Y.2d 161, 165–166, 295 N.Y.S.2d 668, 671–672, 242 N.E.2d 833, 835 (1968):

> When an insured can only prove a small percentage of its claimed loss, a presumption arises that the statement of value and quantity set out in his proof of loss is false and fraudulently prepared. This presumption becomes conclusive where it is shown that the difference between the amounts claimed in the proof of loss and those actually proved to have been destroyed are grossly disparate and the explanation tendered is so unreasonable or fantastic that it is inescapable that fraud has occurred.

Plaintiff's claimed loss of income was $1,479,940.00. It can prove none of it. Zero percent is a "small percentage of its claimed loss." However, I cannot rule as a matter of law that the claimed loss is "grossly disparate" from the proved loss, or that the explanation tendered for the loss is "so unreasonable or fantastic that it is inescapable that fraud has occurred." Plaintiff based its $1,479,940.00 loss of income claim on a projected 35 percent increase in production. Plaintiff did not make this projection in a vacuum; it did so in large part because it enjoyed such an increase the year before. While a jury could find that plaintiff fraudulently misrepresented its loss, that finding is not inescapable. Therefore, the presumption of fraud is not conclusive and defendant is not entitled to summary judgment.

Further, cases dismissing an insured's claim for breach of the "false swearing" clause have done so on much clearer proof of intentional misrepresentation. For example, in *Saks & Co., supra,* 295 N.Y.S.2d at 672, 242 N.E.2d at 835, physical evidence proved the insured lied about the presence of persian rugs allegedly destroyed in an apartment fire. The insured also claimed he lost three quarters of a million dollars worth of gems after the fire by theft, but never took inventory, attempted to secure, or attempted to recover the gems until three months after the fire. In *Oak Point Indus. Park, Inc. v. Massachusetts Bay Ins. Co.*, 143 A.D.2d 79, 531 N.Y.S.2d 329,

330 (2d Dep't 1988), the court dismissed the insured's claim for breach of the contract's false swearing clause after the insured had been convicted of fraud in a separate criminal proceeding stemming from his attempt to defraud the insurance company regarding the same claim.

Plaintiff's explanation supporting its disallowed claim is not so "unreasonable or fantastic" that fraud must be found as a matter of law. Plaintiff's reliance on past sales history and the question of fact as to Fonda's competitive status create questions of fact as to whether plaintiff intentionally misrepresented its claim.

iii. *The extra expense claim*

Defendant also argues that plaintiff misrepresented its extra expenses claim because it calculated its expenses using the full absorption method of accounting and claimed expenses which were in fact not extra. (Hurwitz aff., ¶ 70). Although I have found that plaintiff is not entitled to all the extra expenses which it has claimed, defendant has not shown by clear and convincing evidence that plaintiff intentionally misstated them.

Jack Slawson, plaintiff's director of insurance, negotiated the Policy and the Endorsement for plaintiff. He states that:

> At all times I intended to protect Fold-Pak against a "loss of income" caused by an intervening event such as a fire. It was my understanding that business interruption insurance would enable Fold-Pak to pay normal expenses which continue to accrue when operations are substantially altered or completely interrupted.

(Slawson aff., ¶ 6). Although this expression of plaintiff's intent and understanding of the contract terms is irrelevant in interpreting the unambiguous language of a written contract, *American Home Products Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 765 (2d Cir.1984), intent is the key element to be assessed in determining whether plaintiff intentionally misrepresented its claims.

A jury could find from Mr. Slawson's statement that plaintiff overstated its extra expense claim based on its mistaken interpretation of the terms of the contract. Thus, it is for the jury to decide whether Mr. Slawson's expression of plaintiff's understanding of the Policy and Endorsement is credible.

b. Defendant's Third Affirmative Defense

Defendant also seeks summary judgment based on its third affirmative defense that plaintiff breached the Policy by failing to cooperate. Defendant claims plaintiff breached ¶ 13 of the Policy by not supplying requested documents in a timely manner. Paragraph 13 reads, in relevant part:

> ... Upon the Company's request, the Insured shall exhibit the damaged property to the company and submit to examination under oath by any one designated by the company, subscribe the same and produce for the company's examination all pertinent records and sales invoices, certified copies if originals are lost, permitting copies thereof to be made, all at such reasonable times and places as the Company shall designate.

(Exhibit D to Hurwitz aff.).

The requirement that an insured comply with requests for examinations under oath and requests for documentation is a condition precedent to the insurer's obligation to indemnify. *Rosenthal v. Prudential Property & Cas. Co.,* 928 F.2d 493, 494 (2nd Cir.1991), citing *Ausch v. St. Paul Fire & Marine Ins. Co., supra,* 125 A.D.2d at 50, 511 N.Y.S.2d at 925. (further citations omitted). To be sufficient to void an insurance policy, an insured's failure to cooperate must be willful. Willful refusal to cooperate will be found where refusal is "indicative of a pattern of noncooperation [sic] for which no reasonable excuse for non-compliance has been proffered." *Bulzomi v. New York Central Mut. Fire Ins. Co.,* 92 A.D.2d 878, 459 N.Y.S.2d 861 (2d Dep't 1983). Thus, when an insured can offer no reason for non-compliance, refusal to comply is willful. *Lentini Bros. Moving & Storage Co. v. New York Property Ins. Underwriting Ass'n,* 53 N.Y.2d 835, 836–37, 440 N.Y.S.2d 174, 175, 422 N.E.2d 819, 820 (1981). The insurer must show willful-

ness by a preponderance of the evidence. *Ausch v. St. Paul Fire & Marine Ins. Co., supra,* 511 N.Y.S.2d at 922.

Most of the cases cited by defendant in support of its claim that plaintiff willfully failed to cooperate involve situations where the insured either failed to appear for an examination under oath, appeared and refused to answer questions or completely failed to provide requested documentation. All of the cases involve situations where the insured provided either no reason for non-compliance or an extremely flimsy one. The affidavits submitted in support of these motions render a different factual scenario.

Defendant first made document requests [6] in February 1990. (Harbour aff., ¶ 7). By letter dated March 5, 1990, plaintiff's adjustor informed defendant that plaintiff disagreed that certain of defendant's requests were relevant to the coverage under the Policy. (Exhibit 4 to Second Hurwitz aff.). By letter dated March 14, 1990, defendant informed plaintiff's adjustor that defendant did not agree with plaintiff's assessment of the policy and reiterated its February request for documentation. (Exhibit 5 to Second Hurwitz aff.). In April 1990, plaintiff produced some of the requested documents and informed defendant that the rest were unavailable. (Harbour aff., ¶ 9). Thus, unlike the cases cited by defendant, plaintiff did not flatly refuse defendant's requests without a reasonable excuse. Defendant cites no case in which a court dismissed an insured's lawsuit for failure to cooperate where the insured failed to provide documentation based on a reasonable, albeit mistaken, interpretation of the insurance policy.

Defendant made additional requests under paragraph 13 of the Policy in July 1990, in connection with its examination under oath of plaintiff's employees. (Alper aff., ¶ 8). Plaintiff provided the requested documents in August, stating that to the extent the requested documentation was not provided, it was unavailable. (Exhibit K to Alper aff.). Although defendant was not satisfied with plaintiff's document production (*See* Exhibit L to Alper aff.), defendant's actions did not constitute willful non-compliance with paragraph 13 of the Policy.

It appears that defendant further bases its claim that plaintiff willfully refused to cooperate on plaintiff's alleged "cavalier response" (Hurwitz aff., ¶ 65) in November 1990 to a document request served on it by defendant in October 1990 pursuant to Fed. R.Civ.P. 34 and paragraph 13 of the Policy. By letter dated December 3, 1990, Mr. Hurwitz stated to plaintiff's counsel that plaintiff had provided nothing in response to four of defendant's October requests and was therefore in breach of the Policy. However, the four requests to which Mr. Hurwitz referred were not requested prior to October 1990. Further, it is undisputed that plaintiff has at this time "... complied with substantially all of [defendant's] document requests under the policy." (Defendant's second memo, at 8). Although eventual compliance may not cure an insured's initial non-compliance, *See Abudayeh v. Fair Plan Ins. Co.,* 105 A.D.2d 764, 481 N.Y.S.2d 711, 713 (2d Dep't 1984), such initial non-compliance must be willful. I find that plaintiff's conduct was not "... unexcused and willful refusal to comply ..." *Lentini Bros., supra,* 53 N.Y.2d at 837, 440 N.Y.S.2d at 175, 422 N.E.2d at 820, for which an insurance policy will be voided.

Because defendant has not produced sufficient evidence to show that plaintiff willfully refused to cooperate in violation of paragraph 13 of the Policy, its motion for summary judgment on its third affirmative defense is denied. Further, because of this lack of evidence, and because defendant bears the burden of proving its affirmative defense, plaintiff's motion for partial summary judgment dismissing defendant's third affirmative defense is granted. *See Celotex Corp. v. Catrett, supra,* 477 U.S. at 322, 106 S.Ct. at 2552 (moving party

6. Defendant does not allege that plaintiff failed to cooperate by refusing to appear for examinations under oath.

must make a sufficient showing of each essential element of its case, on which it bears the burden of proof at trial).

## CONCLUSION

For the reasons articulated above, defendant's motion for summary judgment on its second affirmative defense is denied because disputed questions of material fact exist regarding whether plaintiff intentionally misrepresented its claim. For the same reason, plaintiff's motion for partial summary judgment dismissing defendant's second affirmative defense is also denied.

Further, defendant's motion for summary judgment on its third affirmative defense is also denied because defendant has failed to show that plaintiff willfully refused to comply with its requests for documentation under the Policy. For the same reason, plaintiff's motion for partial summary judgment dismissing defendant's third affirmative defense is granted.

Further, defendant's motion for partial summary judgment dismissing plaintiff's claim for "Loss of Production" is granted. Defendant's motion for partial summary judgment limiting plaintiff's "Extra Expense" claim to the actual increased cost of production, striking plaintiff's claim for "management expediting expenses" and reducing the amount of plaintiff's claim for waste by the amount of income plaintiff received from its sale of waste is granted.

Finally, defendant's motion for an order compelling plaintiff to produce documentation, if it exists and has not already been produced, relative to the normal litho production at the Newark facility and the amount of waste sold by defendant is granted.

## ORDER

IT HEREBY IS ORDERED, that defendant's motion for summary judgment is denied.

FURTHER, that defendant's motion for partial summary judgment is granted.

FURTHER, that defendant's motion to compel production of documents is granted. Within thirty (30) days of the date of this Decision and Order, plaintiff shall produce, if it has not already done so, documentation regarding normal litho production at it Newark facility and sale of waste. If plaintiff fails to produce such documentation as ordered, it shall be precluded from using at trial, for the purpose of rebutting defendant's calculation of the amount of normal litho production at its Newark facility or the amount of waste sold by plaintiff, any documents responsive to defendant's requests that it has not produced.

FURTHER, that plaintiff's motion for partial summary judgment is granted in part and denied in part.

SO ORDERED.