388 So.2d 228 (1980)
DAYTONA MIGI OF JACKSONVILLE, INC., Appellant,
v.
DAYTONA AUTOMOTIVE FIBERGLASS, INC., Appellee.
Nos. 00-436/T1-142, 00-470/T1-148.
District Court of Appeal of Florida, Fifth District.
August 6, 1980.
Rehearings Denied September 18, 1980.
*230 S. Gordon Blalock, Jacksonville, for appellant.
J. Doyle Tumbleson, Daytona Beach, for appellee.
SHARP, Judge.
Litigation between Daytona Automotive Fiberglass, Inc. (hereafter called D.A.F.) and two corporations with whom it contracted to do business, Daytona Migi of Jacksonville, Inc. (hereafter called D.M.-Jax) and Daytona Migi Corporation, Inc. (hereafter called D.M.C.), was consolidated for a non-jury trial and for these appeals. The parties took appeals and cross appeals from the final judgment and "amended" judgment.
We affirm the judgment of the lower court which denied any claims or counterclaims between D.A.F. and D.M.-Jax, because there was insufficient evidence to establish that D.M.-Jax violated any copyright or trade-mark belonging to D.A.F. without its knowledge and consent, and because the evidence established the two distributor agreements between the parties never became effective through failure of D.M.-Jax to make the required purchases of Migi body kits. We also affirm the lower court's denial of D.A.F.'s trademark infringement claims against D.M.C. for the same reasons and the allowance of D.M.C.'s replevin count against D.A.F. However, we reverse the judgment of the lower court awarding D.M.C. $51,000.00 damages against D.A.F., and requiring specific performance of the Exclusive Assembly Agreement by D.A.F.
Laverne Martincic is the president of D.A.F. In 1975-76, her husband, Joe, designed and engineered molds to produce a fiberglass body or replica of the 1951 M.G.T.D. D.A.F. fitted the "Migi" body on a Volkswagen chassis, and sold it as an assembled car, or sold the body kit to dealers ready for assembly by them in their facilities. Most of D.A.F.'s sales were in the form of body kits to dealers. In June of 1977, Henry C. Anderson came to Daytona to buy a car from D.A.F. He was so impressed with the car, he opened negotiations with Laverne to become a dealer and master-distributor, to take over the assembly and sales function of the business, and to acquire the ownership and control of D.A.F. He formed D.M.-Jax and D.M.C. to carry out these functions. The Exclusive Assembly Agreement was executed by D.M.C. and D.A.F. on August 19, 1977, and D.M.C. began assembling "Migi's" in a warehouse next door to D.A.F. in Holly Hill.
Laverne and Henry drafted their own agreements without benefit or advice of counsel. The lack of clarity in the draftsmanship led to misunderstandings and a rupture in their relationship. Laverne declared the Exclusive Assembly Agreement and other contracts between D.A.F. and Henry's corporations terminated on January 2, 1978. Henry claimed the Exclusive Assembly Agreement was wrongfully and prematurely terminated by Laverne, and the trial court found Laverne at fault for the breach. The conclusions of the trial judge should not be overturned where there is sufficient evidence to sustain his findings.[1] We do not do so in this case. However, the Exclusive Assembly Agreement was too vague and ambiguous to be specifically enforceable, and D.M.C. failed to establish a sufficient basis for the award of damages based on anticipated profits.
The Exclusive Assembly Agreement had a ten year term. The parties recited that D.A.F. was selling its "assembly division." D.A.F. agreed not to assemble any cars for sale, and to purchase all of its assembled cars from D.M.C. as a "dealer". D.M.C. agreed to sell the assembled cars to D.A.F. *231 dealers, and to the "general public." D.M.C. purchased inventory and equipment, totaling approximately $3,000.00 and assumed overhead expenses for employees and the warehouse. D.M.C. agreed to pay its "pro-rata" share of advertising done by D.A.F.D.M.C. paid D.A.F. $5,381.39 for this contract. Henry and Laverne also executed an option giving him rights to buy the stock of D.A.F. for $150,000.00 and other considerations.[2] They also prepared, but never signed, an "Exclusive Marketing Agreement" after September 1977, which would have given D.M.C. the right to control all sales, advertising, marketing, and use of D.A.F.'s trademarks.
Shortly after executing the Exclusive Assembly Agreement, Laverne and Henry found they had basic disagreements and misunderstandings. Laverne claimed D.M.C. was supposed to pay 40% of her general advertising costs; and Henry said D.M.C. was only responsible for advertising in D.M.C.'s sole name. The agreement does not cover these points.[3] D.M.C. refused to sell D.A.F. assembled cars at any discount, even though the agreement provided D.A.F. would sell D.M.C. the body kits at a 40% discount, and "act in the capacity of a dealer of S.R.I. assembled products." D.M.C. then objected to D.A.F. assembling cars itself to fill its dealer's orders. Henry later took the position that D.M.C. had the right under this agreement to set up dealers, grant exclusive distributorships, and engage in general advertising and promotional efforts using D.A.F.'s trademark and trade name. Laverne strenuously objected to this, pointing out that the agreement granted D.M.C. only exclusive assembly rights and the right to sell to D.A.F. dealers and distributors. Again, the agreement fails to cover these disputed points.[4]
The basic terms of the Exclusive Assembly Agreement are so unclear and so indefinite as to make specific performance an improper remedy for its breach. Bay Club, Inc. v. Brickell Bay Club, Inc., 293 So.2d 137 (Fla. 3d DCA 1974); Brown v. Dobry, 311 So.2d 159 (Fla. 2d DCA 1975); see Unatin v. Hudon, 383 So.2d 1131 (Fla. 5th DCA 1980). As stated in Dobry, "it must appear from the writing constituting the contract that the obligation of the parties with respect to conditions of the contract ... are clear, definite and certain." 311 So.2d at 160. Nor are we aided in this case by the "custom and practice" of the parties,[5] since the disagreements surfaced almost as soon as the document was signed. The agreement in this case contains such large gaps of vital terms, it cannot be specifically enforced, particularly over a ten year period.
As explained by the trial judge at the hearing on motion for new trial, the award of $51,000.00 to D.M.C. was based on the projected profit D.M.C. would have made on sales of cars, had the assembly agreement been performed over a period of one year and five months (from January 2, 1978 to date of the judgment). A total profit on sales of $3,000.00 per month would require D.M.C. to sell at least 6 cars per month, and realize a profit of $500.00 per car. Henry testified the largest number of cars D.M.C. ever had under assembly at one time was eight to nine. He projected profits of $1,315.00 and $1,870.00 per car on sales to dealers, based on sales of 35 to 40 assembled cars per month. But D.M.C. did not have the capacity to assemble that many cars, nor did D.A.F. have the capacity *232 to produce that many body kits per month. Henry admitted D.M.C. never made any profit on any of its sales during the six months the agreement was operating. Laverne testified D.A.F. "assembled" only one to two cars per month, and she did not know what her company's net profit was on assembled cars. D.A.F. realized a profit of $400.00 to $500.00 per sale on sales of the body kits to dealers.
Based on this record, the award of damages totaling $51,000.00 to D.M.C. cannot be upheld. Florida Outdoor, Inc. v. Stewart, 318 So.2d 414 (Fla. 2d DCA 1975); Innkeepers International, Inc. v. McCoy Motels, Ltd., 324 So.2d 676 (Fla. 4th DCA 1975). In order to recover lost profits, there must be an on-going business with an established sales record and proven ability to realize profits at the established rate. Conner v. Atlas Aircraft Corp., 310 So.2d 352 (Fla. 3d DCA 1975); Belcher v. Import Cars, Ltd., 246 So.2d 584 (Fla. 3d DCA 1971).
However, where it is not possible to establish lost profits as a measure of damages in a breach of contract case, it is possible to recover other kinds of damages, such as lost capital, investments, expenses and out-of-pocket costs.[6] D.M.C. established a basis for an award of this kind of damages. Therefore, we remand this matter to the trial court for a redetermination of the amount of damages due D.M.C. from D.A.F. consistent with this opinion. Because of the lapse of time since the trial, the lower court may in its discretion rely on the record or take additional testimony concerning D.M.C.'s damages.
We affirm the award of $8,937.35 to D.A.F. against D.M.C. on its counterclaim, but it shall be stayed, pending the redetermination of damages for D.M.C.
AFFIRMED in part; REVERSED in part and REMANDED.
BROWNLEE, JACKSON O., Associate Judge, concurs.
CROSS, J., concurs only in conclusion.
NOTES
[1] Shaw v. Shaw, 334 So.2d 13 (Fla. 1976); Greenwood v. Oates, 251 So.2d 665 (Fla. 1971); Cohen v. Mohawk, Inc., 137 So.2d 222 (Fla. 1962).
[2] This option was the subject of other litigation not involved in these suits.
[3] The Agreement was between D.A.F. and Southern Repli-Car, Inc., which later changed its name to D.M.C. Paragraph 10 provided:

S.R.I. agrees to pay its pro-rata share of the assembled product advertising placed in conjunction with the advertising of D.A.F. In all forms of national, regional, and local mediums including its pro-rata share of the cost of Daytona Migi color brochures and video tapes depicting assembled products of S.R.I.
[4] Paragraph 4 of the Agreement provided only:

D.A.F.I. will recommend to their dealers, the purchase of assembled units from S.R.I. and will supply a list of dealers to S.R.I. so that they may contact the dealers and advise them of costs on assembled units.
[5] § 672.208 Fla. Stat. (1979); Restatement of Contracts §§ 245-249 (1932).
[6] 17 Fla.Jur.2d Damages § 28 (1980). Plantation Key Developers v. Colonial Mortgage, 589 F.2d 164 (5th Cir.1979); Calamari and Perillo, Contracts § 205, p. 327 (1970). Restatement of Contracts § 333 (1932).