**CONTINENTAL INSURANCE COMPANY, Plaintiff–Respondent,**

v.

**DNE CORPORATION, Defendant–Petitioner.**

Supreme Court of Tennessee, at Nashville.

July 20, 1992.

John W. Stapp, IV, Donald Capparella, Manier, Herod, Hollabaugh & Smith, Nashville, for defendant-petitioner.

Michael Miller, Maddin, Miller & McCune, Nashville, H. Michael Bagley, Daniel C. Kniffen, Drew, Eckl & Farnham, Atlanta, Ga., for plaintiff-respondent.

## OPINION

DAUGHTREY, Justice.

Pursuant to Rule 23 of the Rules of the Tennessee Supreme Court, the United States Court of Appeals for the Sixth Circuit has certified two questions to this Court arising out of a declaratory judgment action, in which the plaintiff insurance company asked the federal district court to determine the scope of coverage provided by a business-interruption insurance policy issued to the defendant corporation.

### 1.  QUESTIONS CERTIFIED

The questions are as follows:

1.  Under Tennessee law, is DNE Corporation entitled to recover the amount of its "continuing normal operating expenses" under the terms of a business interruption insurance policy issued to it by Continental Insurance Company?

2.  If, and only if, the answer to the first question is in the affirmative, then, under Tennessee law, is DNE Corporation entitled to any recovery for the period February 20 to April 30, 1989, during which DNE Corporation converted its non-cash assets into cash and liquidated its liabilities?

By separate order entered simultaneously with this opinion, we have accepted certification of these two questions. Because we conclude that the first question must be answered in the negative, we do not have to address the second question.

### 2.  FACTUAL AND PROCEDURAL HISTORY

As noted above, the plaintiff, Continental Insurance Company, filed a declaratory judgment action in the United States District Court for the Middle District of Tennessee, following repeated demands by its insured, defendant DNE Corporation, for reimbursement of its operating expenses under a business-interruption policy issued by Continental Insurance Company.

DNE is a Utah corporation engaged in the business of developing transmission and gear products for the automotive industry. It had a plant located in Brentwood, Tennessee, that had been operating at a loss for some period of time prior to December 1988.

On the evening of December 23, 1988, the DNE facilities in Brentwood were heavily damaged by a tornado. At that time, DNE was insured under a business-interruption policy issued by Continental Insurance, the pertinent provisions of which are as follows:

A.  COVERAGE

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by a direct physical loss of or damage to property at a premises described in the Declarations, including "contingent business property" at a premises described in the Declarations and personal property in the open (or in a vehicle) within 100 feet of a premises described in the Declarations, caused by or resulting from any Covered Cause of Loss.

1.  Business Income

Business Income means the:

a.  Net Income, (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.  Continuing normal operating expenses incurred, including payroll.

The following facts have been stipulated by the parties:

(1) DNE Corporation sustained property damage to its facilities at 7105 Moores Lane, Brentwood, Tennessee, as a result of a tornado that occurred on or about December 23, 1988. These facilities were covered under an insurance agreement issued by Continental Insurance Company, more specifically referenced as Policy No. CBP6014156 ("the Policy"),

attached hereto and incorporated herein as exhibit "A".

(2) DNE Corporation incurred and paid continuing operating expenses for the period from December 24, 1988 through February 20, 1989, in the amount of $395,000, which qualify as continuing normal operating expenses defined in the Business Income Coverage Form # SCP.0030 of the Policy.

(3) DNE Corporation incurred and paid continuing operating expenses for the period February 21, 1989, through April 30, 1989, in the amount of $190,000, but the issue of whether these expenses qualify as continuing normal operating expenses as defined in the Business Income Coverage Form No. SCP 0030 of the Policy is an issued to be determined by the Court pursuant to issue two below.

(4) For the period December 24, 1988, through February 20, 1989, DNE would have had a net loss before income taxes in excess of $395,000.

(5) For the time period from February 21, 1989, through April 30, 1989, DNE would have had a net loss in excess of $190,000.

(6) The period of restoration in the Business Income Coverage Form No. SPCP 0030 of the Policy, is the period from December 24, 1988, to and including April 30, 1989.

(7) In a resolution adopted by the Board of Directors of DNE Corporation on January 20, 1989, it was deemed to be in the best interest of the corporation to convert all non-cash assets of DNE Corporation into cash and liquidate the liabilities of the corporation. On February 16, 1989, a Special Shareholders' Meeting was held at which the resolution adopted by the Board of Directors of DNE Corporation on January 20, 1989, was adopted and approved.... Thereafter, on February 20, 1989, DNE Corporation consummated the conversion of its non-cash assets to cash and the liquidation of its liabilities.

The United States District Court held that DNE Corporation was not entitled to any recovery under the business-interruption insurance policy. The court's conclusion was based on its determination that the amount of "business income," as defined in the policy, is determined by adding the amount of "net income" (which may be either a net profit or net loss) to the amount of "continuing normal operating expenses." The district court rejected the interpretation of the policy offered by DNE, which the district court stated as follows:

> DNE contends that each portion of the definition should be considered separately, and that Continental should pay the continuing operating expenses regardless of how that amount compares to the net profit or loss.

Having found in favor of Continental Insurance on the first issue, the district court did not address the second issue.

DNE appealed the district court's ruling to the Sixth Circuit Court of Appeals, which has asked us to resolve the dispositive issue on appeal.

### 3. LEGAL ANALYSIS

Under the terms of the policy, DNE Corporation is entitled to recovery only if it sustained an "actual loss of business income," which is defined as net income that would have been earned had the business not been interrupted *and* continuing normal operating expenses that were incurred during the interruption of business.

■ It seems obvious to us from the wording of the policy that in any given case, the amount of "business income" will be a number that is the sum of a second number ("net income," which may be either a net profit or a net loss) and a third number (continuing normal operating expenses incurred). The "business income" provision of the policy clearly indicates that the amount of business income is to be determined by adding the second number and the third number together, and not, as contended by DNE, by looking only to the third number and completely ignoring the second number. This is the interpretation given the provision by the district court, and it is in accord with decisions in other cases involving similar issues.

The case that is most similar to the current one is *Goetz v. Hartford Fire Ins. Co.,* 193 Wis. 638, 215 N.W. 440 (1927). In that case, the liability of the insurance company that had issued a business-interruption insurance policy depended on the interpretation of the following policy provision:

This (insurance) company shall be liable under this policy for the *actual loss sustained,* consisting of net profits of the business which is thereby prevented, and such fixed charges and expenses pertaining thereto as must necessarily continue during a total or partial suspension of business and such expenses as are necessarily incurred for the purposes of reducing the loss under this policy, for not exceeding such length of time ... as shall be required ... to rebuild, repair or replaced such part of said buildings and machinery and equipment as may be destroyed or damaged.

*Id.* 215 N.W. at 441 (emphasis in original).

The Wisconsin Supreme Court noted in *Goetz* that it must determine the amount of the "actual loss sustained." In this regard, the court stated as follows:

It is not questioned that at least two separate and distinct elements are recognized in this provision of the contract which may go to make up the "actual loss sustained" to indemnify for which the defendants undertook; namely, one of "net profits," and the other of "fixed charges and expenses." The element of "net profits" drops from this case; the jury having found that none such would have been made during the same period if no such suspension had occurred.

*Id.*

The facts of the business operation considered in *Goetz* were similar to those involved in this case, as can be seen by the following observation of the Wisconsin Supreme Court:

The jury reached the unchallenged conclusion that, had no fire intervened and the business continued during the 49 days, there would have been not only no profits made but a loss sustained of $4,062.64, an excess over the fixed charges and expenses of $3,820.30 during the same period. The insured having suspended business, it avoided of course such loss of over $4,000, with its consequent depletion of assets or additional liabilities to that extent.

*Id.*

The Wisconsin Supreme Court denied the insured any recovery. It determined that the number sought (the amount of "actual loss sustained") was the sum of "net profits," which was a negative number, and the amount of "fixed charges and expenses." Inasmuch as the sum was a negative number, no recovery was allowed.

Another very similar case is *United Land Investors, Inc. v. Northern Insurance Company of America,* 476 So.2d 432 (La.App.1985). In that case, the business-interruption insurance policy provided that the insured could recover for a loss of "earnings." "Earnings" was defined in the insurance policy as follows:

For the purposes of this insurance, "earnings" are defined as net profit plus payroll expense, taxes, interest, rents, and all other operating expenses earned by the business.

*Id.* at 435.

As in the current case, the policy at issue in *United Land Investors* provided that the number representing the amount of "earnings" consisted of a second number, the amount of "net profit," combined with a third number, the amount of "payroll expense, taxes, interest, rents and all other operating expenses." Under the facts of that case, the second number (net profit) was minus $48,023, and the third number (all operating expenses) was $168,640. The Court in that case determined that the number sought ("earnings") was the sum of the second and third numbers, or $120,617. The court rejected the contention of the insured that the second number (net profit) should be ignored because it was a negative number and that the number sought should consist of the third number alone (all operating expenses).

In this case, DNE Corporation urges us to reject the rulings in *Goetz* and *United Land Investors* and adopt instead the approach taken by the Washington Supreme

Court in *Washington Restaurant Corporation v. General Insurance Company of America,* 64 Wash.2d 150, 390 P.2d 970 (1964). We conclude that DNE's reliance on that case is misplaced. Although the facts of the insured's business operations were similar to those involved here, the provisions of its business-interruption insurance policy were completely different.

The court in *Washington Restaurant Corporation* described the facts in that case as follows:

> "Although the monthly net loss averaged $3,441 prior to the fire, the expenses which necessarily continued after the fire averaged only $2,933.33 for the first three months. It is therefore readily apparent that the net operating loss was actually reduced during this period."

*Id.,* 390 P.2d at 971. Under the terms of the insurance policy involved in *Washington Restaurant Corporation,* the insured could recover for the first $3,000 of "gross earnings" during the applicable period of time. Unlike the policies at issue in the instant case and the other cases described above, the key term, "gross earnings," was not defined in the insurance policy. The Washington Supreme Court was thus free to interpret that term and did so as follows:

> Gross earnings is nowhere defined and, presumably, is left to general accounting principles. Under the evidence, gross earnings was found to be the total sales, less cost of goods sold.

*Id.* at 973. According to the testimony of accountants, the "gross earnings" figure for the period of time in question was $7,445. The Washington court allowed a recovery for the first $3,000 of "gross earnings."

Given the complete lack of similarity between the insurance policy provisions contained in *Washington Restaurant Corporation, supra,* and those involved in this case, we conclude the holding in that case is irrelevant to the construction of the policy in this case.

### 4. CONCLUSION

As the federal district court noted in its memorandum opinion in this case:

The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred. *Northwestern States Portland Cem. Co. v. Hartford E.I. Co.,* 360 F.2d 531 (8th Cir.1966); 83 A.L.R.2d 885. A related rule is that a policy of this type may not be used to place the insured in a better position than it would have occupied in the absence of the catastrophe. *Supermarkets Operating Co. v. Arkwright Mutual Insurance Co.,*m 257 F.Supp. 273, 277 (E.D.Penn.1966).

Contrary to the general rule, the interpretation advocated by DNE Corporation (*i.e.,* ignoring "net income" whenever there is a net loss) would put the insured, in all cases when there is a net loss, in a better economic position from having had its business interrupted than it would have occupied had there been no interruption of its business operations. Such an interpretation would obviously be inconsistent with the purpose of providing insurance, as well as with the decisions in other cases involving similar issues.

We therefore conclude that the amount of "business income" under the insurance policy provision involved in this case should be determined by adding the amount of "net income" and the amount of "continuing normal operating expenses." Under this approach, if "net income" is a positive number (which will occur whenever there are net profits), the amount of "business income" will be the sum of two positive numbers, and the insured will be entitled to recover that amount. If, however, "net income" is a negative number (which will occur whenever there is a net loss), the amount of "business income" will be the amount of "continuing normal operating expenses" reduced by the amount of the net loss. If, as under the facts of this case, the amount of the net loss that would have been incurred had there been no business interruption *exceeds* the amount of normal operating expenses actually incurred, the resulting number is a negative number,

and there can be no recovery for an "actual loss of business income."

Because the amount of DNE's "business income" in this case is, in fact, a negative number and there can be no recovery under the policy issued by Continental Insurance, it is unnecessary for us to address the second certified question.

We therefore advise the United States Court of Appeals for the Sixth Circuit that the answers to the questions certified to us are as follows:

1.   Under Tennessee law, is DNE Corporation entitled to recover the amount of its "continuing normal operating expenses" under the terms of a business interruption insurance policy issued to it by Continental Insurance Company? *NO.*

2.   If, and only if, the answer to the first question is in the affirmative, then, under Tennessee law, is DNE Corporation entitled to any recovery for the period February 20 to April 30, 1989, during which DNE Corporation converted its non-cash assets into cash and liquidated its liabilities? *PRETERMITTED BECAUSE NOT APPLICABLE.*

The Clerk will transmit this opinion and the accompanying order in conformity with Rule 23.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.