**DICTIOMATIC, INC., a Florida corporation, and Domingo Linale, an individual, Plaintiffs,**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY, a Maryland corporation, Defendant.**

**Nos. 93–2123–CIV, 94–1692–Civ.**

United States District Court, S.D. Florida, West Palm Beach Division.

Jan. 21, 1997.

John J. Pappas, Butler, Burnette & Pappas, Tampa, FL, for defendant.

Joseph R. Buchanan, Wampler, Buchanan & Breen, Miami, FL, for plaintiff.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

PAINE, District Judge.

*Jurisdiction*

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 2201.

*Background*

Prior to trial, this court bifurcated the bad faith and fraud claims from the breach of contract claims. Thereafter, Dictiomatic's Breach of Contract claims in Case No. 93–2123 (Count I and II) and USF & G's Declaratory Judgment Action in Case No. 94–1692 were tried before the court from December 2, 1996 through December 13, 1996. Upon consideration of all of the evidence presented in the Plaintiff's case in chief, as well as the applicable authority, pursuant to Federal Rule of Civil Procedure 52(c), the court concluded at the end of Plaintiff's case in chief that the Plaintiff failed to carry its burden of proof by a preponderance of the evidence that Dictiomatic incurred expenses or suffered actual loss of business income during any of the proposed restoration periods [1] as a result of the suspension of operations due to Hurricane Andrew. Pursuant to Rule 52(c), the court enters the following Findings of Fact and Conclusions of Law in support of its *ore tenus* ruling. Because the court found that Plaintiff failed to carry its burden of proof, the court makes no further findings of fact as to any of the Defendant's affirmative defenses, including the defense of fraud.

*FINDINGS OF FACT*

1. Dictiomatic, which was incorporated in 1987, was a developer of consumer electronic products. Domingo Linale ("Linale") was the founder, president and sole shareholder of the company.

2. From June, 1989 to 1991, Dictiomatic enjoyed economic success with the development and sale of its Hexaglot T–427 translator product, a hand held unit that offered cross translation of words into six different languages. From 1989–1991, over 120,000 T–427 units were sold through distributors in markets outside of the United States, mostly in Europe.

3. In 1990, Dictiomatic began developing its second generation of hand-held multilingual electronic translators, the Hexaglot T–150. The T–150 offered translation of five basic languages (English, Spanish, French, German, and Italian) and one additional language as selected by distributors to open up new markets, from among Turkish, Icelandic, Portuguese, Swedish or Hungarian. Approximately 80,000 T–150 units were sold in 1990 and 1991.[2]

4. In late 1990 and early 1991, Dictiomatic began development of its third generation of hand-held electronic translators, the T–1200 and T–1500. Because Dictiomatic sold the right to use the name "Hexaglot," the T–1200 and T–1500 products did not carry the same name as Dictiomatic's prior successful products. Further unlike the prior products, the T–1200 and T–1500 were the first generation of talking translators. In addition to providing translation of a word in writing, the user heard the word or phrase pronounced via a built in speaker. The in-court demonstration of the product revealed that the sound quality of the speaker was poor and that the pronunciation was not clearly discernible. The T–1200 was an English to Japanese translator. The T–1500 series contained the T–1501 which included English, French, and Spanish; the T–1502 which included English, French and Italian, and the T–1503 which included English, French and

---

**1.** At trial, the Plaintiff contended that the restoration period began on August 24, 1992, the date of the hurricane and ended in December, 1993, thirty days plus twelve months after Plaintiff regained possession of the damaged premises. The Defendant contended that the restoration period began on August 24, 1992 and ended, at the latest, on October 15, 1992, thirty days after Plaintiff regained access to the damaged premis-es, providing Plaintiff could prove loss of business income during the thirty days immediately following the date Plaintiff regained possession of the damaged premises.

**2.** The court makes these approximate findings in light of the fact that the Plaintiff's record keeping for 1989–1992 did not reveal accurate, reliable figures for sales, income and expenses.

German. These products had a retail list price of $199. Like the prior Dictiomatic products, the T–1200 and T–1500 products were manufactured by Singatronics, Ltd. of Singapore. In the Fall of 1991, Singatronics manufactured 20,000 of these products.

5. At a consumer electronics show in the Fall of 1991, Linale learned that the distributors to whom he presented the T–1200 and T–1500 series product for sale in Europe and Latin America were unhappy with it. It was not a six language translator as Linale had promised when he presented a preliminary proof of concept at a prior show in January, 1990. The distributors also concluded that the product, which contained only 2,700 words per language, was not sufficient to serve educational needs. Because the buyers had no confidence in their ability to sell the T–1200 and T–1500 products, they did not want to buy the product which Dictiomatic had already developed and manufactured. Accordingly, the method of distribution and sale previously employed by Dictiomatic to sell its Hexaglot T–427 and T–150 products was not successful. By mid–1992, Dictiomatic had approximately 17,000 T–1200 and T–1500 units stored at Singatronics and was incurring monthly interest charges thereon. All of Dictiomatic's projections of sales for the T–1200 and T–1500 from the time it was introduced through August, 1992, were wrong and, due solely to the lack of demand for the product at the stated price, the anticipated sales of this product were never realized during the period through August 24, 1992.

6. Due to only minimal sales of the T–1200 and T–1500 and the debt from the product development and storage of the unsold products, by mid–1992, Dictiomatic was not receiving any business income and only minimal revenue from sales. In fact, in order to pay operating expenses and overhead, Dictiomatic was relying on capital investments from Warren M. Ross, a business man from New Jersey who, in reliance upon Linale's projections of sales, invested $100,000 in Dictiomatic through August, 1992 in order to keep Dictiomatic operating.

7. Dictiomatic admits that there was never a proven successful market for the T–1200/1500. It had more than 17,000 T–1200/1500 talking translators in inventory and ready for sale for more than ten (10) months before Hurricane Andrew occurred, and Dictiomatic admits that its sales prior to August 24, 1992 were minimal; supply outweighed demand for the product. Dictiomatic admits that the market simply was not interested in purchasing its T–1200/1500 talking translators from October 1991 through August 23, 1992 (the day before Hurricane Andrew hit). In the summer of 1992, in an attempt to move the T–1200 and T–1500 products which were largely rejected by the intended European market, from Singatronics, Dictiomatic decided to target the sale of this disappointing product to American overseas travelers at the time they purchased their ticket to travel. Having decided that the most direct form of marketing the product to this consumer market was through travel agencies and computer on-line reservation systems, Dictiomatic was, at the time of the Hurricane, implementing a new way of marketing its only product, the T–1200/1500 talking translators. Dictiomatic hoped that the new marketing system would have resulted in substantial sales before December 31, 1992. Dictiomatic's new marketing plan consisted of a combination of advertisements in newspapers, trade journals, an endorsement by the American Society of Travel Agents (ASTA), and a program instituted with travel agencies and their travel agents throughout the United States where these agents could receive a $40 commission for each sale of a T–1200/1500 talking translator to a traveler they persuaded to buy over the telephone, and an on-line computer reservation system where such sales could be communicated to Dictiomatic. Additionally, prior to the Hurricane, Dictiomatic sought and ultimately received the endorsement of ASTA, another element in its planned implementation of the new marketing scheme. There was no evidence presented that such an endorsement indicated any kind of quality evaluation of the product or any kind of prediction of likelihood of sales. In preparation for the ASTA convention in September, 1992, Dictiomatic had prepared artwork for display at the convention in an attempt to decorate its display booth and attract people to examine

the product. Although Dictiomatic hoped and projected that the new marketing system would create sales of the T–1200 and T–1500 products, there was no competent corroborative evidence presented that this type of telephone marketing system was ever successful in selling high-priced electronic products. On August 10, 1992, the first of these reservation systems was installed. The second reservation system was to be installed on August 24, 1992.

8. While the Plaintiff presented evidence through Linale that Dictiomatic's future research and development of new products was dependant upon the revenue expected to be realized from the sales of the T–1200 and T–1500 products to the newly targeted American overseas traveler, the court finds that such profits were far too speculative and not sufficiently established to make this a reasonable expectation. First of all, at the time the new marketing strategy was implemented, the T–1200 and T–1500 products were not new products. The Plaintiff's own evidence established that the shelf-life of even new technology is limited. Second, this product was proven to be a poor seller even at the time of its advent. Third, although the exact cost of the product was between $91 and $150,[3] in order to effect the new promotional scheme, Dictiomatic was selling many of the few products it actually sold at an amount at or under the actual cost of the product, with the hope that this loss-leader would generate future sales. In addition, the payment of commission to the selling agent further eroded the expected profits from the T–1200 and T–1500 products, thereby making it less likely that Dictiomatic would realize significant profits, even in the event this alternate marketing scheme was successful. Accordingly, to the extent that Dictiomatic's future and its claim of loss of business income and profits relied upon the sale of the T–1200 and T–1500 products through the new marketing system, the court finds that Dictiomatic failed to prove by a preponderance of the evidence that the T–1200 and T–1500 products would have sold after August 24, 1992, if only the hurricane and USF & G's subsequent denial of its claim had not occurred.

9. The evidence establishes that on August 23, 1992, Dictiomatic was a company in debt with *de minimis* business income, with an overstocked inventory of undesirable products located in Singapore, attempting to posture to sell these products through a speculative marketing scheme that had never proved to be successful in selling electronic products. Further, it had no more than $5,000 cash on hand and was carrying substantial debt in excess of one million dollars[4] as a result of its investment in the development and manufacture of the T–1200 and T–1500 products and the subsequent lackluster sales thereof.

10. Meanwhile, in response to the negative reaction of his European and Latin American distributors to the limited language and vocabulary of the T–1200 and T–1500 products, in 1991 Dictiomatic began research and development of the T–3000, a talking translator with a 6,000 word vocabulary. Linale believed but did not prove through corroborative, objective evidence, that if he could present a prototype product to distributors by mid–October, they would contract through letters of credit for the purchase of the T–3000 for Christmas season sales in 1992. Dictiomatic failed to produce any contract or letter of intent, or witness or other competent evidence to corroborate Linale's belief that these distributors would finance the production of the T–3000 units through letters of credit. Additionally, the evidence is clear that prior to August 24, 1992, Dictiomatic did not have sufficient capital available to it to finance the continuing development, manufacture, or marketing of the T–3000.

---

3. Because of inconsistencies in Plaintiff's proof and sloppy financial records, the court is unable to determine the exact cost of the product. However, testimony from Plaintiff's own witnesses and documents reveal varying determinations of cost somewhere in this monetary range.

4. Again, due to inconsistencies in Plaintiff's proof and sloppy record keeping, the court is unable to determine the exact amount of debt. The evidence is clear and consistent, however, that at the time of the Hurricane the Plaintiff's debt was substantial and was in an amount in excess of $1,000,000.

11. On or about August 24, 1992, Hurricane Andrew damaged the Datran Center in South Miami, Florida, thereby denying Dictiomatic access to its leasehold office space, located on the fourth floor, until September 4, 1992. The insured premises had phones, fax machine, and a single on-line travel reservation computer system. Dictiomatic was not a manufacturer of its products and neither its production facilities, which were independently contracted out to Singatronics in Singapore, nor its inventory, which was also located in Singapore, was damaged or interrupted by Hurricane Andrew.

12. By September 14, 1992, Dictiomatic was back in operation at the described insured premises. By October, 1992, Dictiomatic had all five reservation systems on line and operating. Notwithstanding the fact that Dictiomatic was back in operation and on-line with the new marketing scheme, the implementation of which was delayed only 1 month by the Hurricane, Dictiomatic sold *de minimis* numbers of the T–1200 and T–1500 through the end of the year. Dictiomatic's original business interruption claim included alleged lost sales of the T–1200/1500 from August 24 through December 31, 1992. Dictiomatic claims that but for Hurricane Andrew, it would have sold more than 7,250 T–1200/1500 talking translators resulting in sales of $1,266,791 during these four (4) months. Dictiomatic failed to prove that it would have realized these sales or any profits sufficient to fund the production of the T–3000. The court finds that Dictiomatic's failure to sell the T–1200 and T–1500 products after August 24, 1992, was not the result of Hurricane Andrew. Rather, the lack of sales was due to the fact that, just as before the Hurricane, these products were not in demand and the telephone marketing scheme was not an efficient way to sell high priced electronic products.[5]

13. Notwithstanding the hurricane, Linale attended the ASTA convention in Cairo, Egypt in September, 1992, as previously planned, to present the T–1200 and T–1500 products to travel agents to motivate them to sell the product over the telephone. Dictiomatic contends that the absence of the artwork, which was prepared to decorate its booth at the ASTA convention and destroyed in the hurricane, hindered Dictiomatic's ability to create excitement among the travel agents to sell the T–1200 and T–1500 products. The court finds that Dictiomatic had the actual product at the convention and could have demonstrated the product itself, and that the lack of sales after the convention was not due to the loss of the artwork but, rather, was due to the poor quality, high price, and ongoing lack of demand for these products, all of which predated the hurricane. Specifically, the court finds that the loss of the artwork as a result of the hurricane did not cause Dictiomatic loss of business income for purposes of entitlement to compensation under the insurance contract with USF & G; the Plaintiff simply did not prove that but/for the loss of the artwork at the convention, it would have enjoyed sales of the T–1200 and T–1500 which it had not experienced in the entire time the products were on the market before the hurricane. Dictiomatic admitted at trial that during October, November, December 1992, and January, February, and March 1993, telephone lines were up, advertisements were out, numerous travel agencies and travel agents were aware of the new marketing program with product in hand, and, as before, there were more than 17,000 of the T–1200/1500 talking translators in inventory, and sales were minimal.

14. Before the end of September, USF & G paid Dictiomatic its business personal property limits of $50,000.

15. Although Dictiomatic contends that its business personal property damages actu-

---

**5.** Dictiomatic itself contends in this law suit that the unavailability of artwork at a convention booth hampered its ability to motivate sales of these products even though the targeted convention group was otherwise able to see, hold, and operate the product itself. At the same time, Dictiomatic contends that but for the Hurricane which caused only a one-month delay in getting started with its new marketing scheme, it would have sold the T–1200 and T–1500 products over the telephone when the potential buyer cannot even see the product itself. These contentions are essentially at odds with one another and reflect negatively upon Dictiomatic's overall credibility in this law suit.

ally exceeded $100,000, it admitted at trial that it never repaired or replaced any of its business personal property for which the insurance contract limits were tendered.

16. At trial, Dictiomatic claimed that but/for hurricane Andrew, it would have sold 30,000 T–3000 "talking translators" resulting in $3,450,000 in sales before December 31, 1992. The court finds that the Plaintiff has failed to establish by a preponderance of the evidence that but/for hurricane Andrew, the T–3000 would have been completed, manufactured, advertised, and sold prior to the end of the year. The evidence falls woefully short of establishing with any requisite preponderance of proof, that but/for hurricane Andrew, sales of the T–3000, a product that did not exist on August 24, 1992, would have reached 30,000 product sales in the short four months following the hurricane.

17. It is undisputed that at the time hurricane Andrew hit South Florida, the T–3000 did not exist. It is further undisputed that after hurricane Andrew, neither Dictiomatic nor anyone else ever manufactured the T–3000 or made any further effort to manufacture this product which, Dictiomatic contends but/for hurricane Andrew, was to be a source of great revenue for this fledgling company. Dictiomatic also contended at trial, but failed to prove, that the loss of 150 reel-to-reel tapes with English and other languages in a cardboard box on the floor in it's office at The Datran Center during hurricane Andrew, caused delay in development and production of the T–3000 which resulted in loss of sales and business income which is compensable under the business interruption insurance contract. Dictiomatic alleges that these tapes, which allegedly had been in production for months and were an early step in the manufacturing of the T–3000, were damaged by the windblown rain from hurricane Andrew. However, although Dictiomatic alleges that by August 24, 1992, approximately 150 reel to reel tapes had been recorded in French, Spanish and English, and had been edited and ready for delivery to Singatronics to commence the electronic digitization and compression process, there was no competent, objective, corroborative evidence presented to prove this allegation. The tapes themselves, which survived the hurricane and remained on Dictiomatic's premises immediately thereafter, were discarded by the Plaintiff, thereby considerably handicapping its ability to prove the existence and completion of these tapes on August 24, 1992. Aside from an invoice from a single recording studio which itself is questionable in light of the lack of sufficient identifying address and phone number thereon, there was no direct evidence presented by any sufficiently credible document or non-biased witness who might have participated in the recording of the tapes or any witness from any of the recording studios. The Plaintiff failed to establish by requisite proof that the tapes which were located on the premises of its Dade County office in 1992 were complete and ready for delivery to Singatronics in early September, 1992. Further, although Dictiomatic had projected that Singatronics could accomplish the manufacture of these products in time for delivery for the Christmas season, the court finds that this projection was speculative in light of the fact that Dictiomatic's projected time equation had not afforded any time for delay. It was unreasonable and speculative for Dictiomatic to assume that Singatronics could manufacture this sophisticated product in time for worldwide distribution and sale in advance of the Christmas holiday when in the past the manufacture of such sophisticated talking translators had been handicapped by delay. Furthermore, despite Dictiomatic's contention that it expected the T–3000 to be on sale for the Christmas season in 1992, as of August 24, 1992, Dictiomatic had not placed any advertisement for sale or evidence of any marketing plan for sale of the T–3000 which was to take place before the end of the year. Finally, if in fact the 150 tapes were complete and essential to the future success of the company, it was unreasonable for the Plaintiff to dispose of the tapes prior to seeking any expert examination of the tapes and conclusion that the tapes were, in fact, rendered unusable by hurricane damage. Without such evidence, it is impossible for the Plaintiff to carry its burden and, in fact, the court finds that it did not carry its burden of proof that the hurricane caused damage to the tapes which in turn caused loss of busi-

ness income to Dictiomatic from sales of the never-produced T–3000.

18. Although Dictiomatic contends these tapes would have taken no more than two months to recreate, at no more than a cost of $60,000, and although after the hurricane Dictiomatic received $50,000 from USF & G, $100,000 in loans, and more than $300,000 from the Small Business Administration, it never even attempted to repair or replace any of these tapes in order to proceed with the production of the T–3000. This is true although Dictiomatic was fully operational in September and did not cease doing business until June 1993.

19. The Plaintiff failed to prove that prior to hurricane Andrew, it had taken any action which thereafter was hindered by hurricane Andrew, to produce yet another non-existent product, the palm top computer. The court finds that Plaintiff's projection of sales of the palm top are far too speculative to establish that Plaintiff lost any business income from the lack of development, production, and · sales, as a result of hurricane Andrew.

20. In October, 1992 Dictiomatic submitted a written claim to USF & G for business interruption loss of $1,360,747 for alleged lost profits and earned continuing expenses incurred from August 24 through December 31, 1992. It later supplemented its claim to account for alleged loss of business income through June, 1993, when it went out of business.

21. At Defendant's request, during the processing of the claim the Plaintiff provided information in the form of summaries of projected sales and sworn statements under oath. However, the information provided was later supplemented and even completely altered from time to time during the processing of the claim, which delayed USF & G's decision as to whether a valid business interruption claim existed. Additionally, the evidence shows that the summaries of past profits the Plaintiff provided to the Defendant in support of its claims of past sales were not accurate inasmuch as bookkeeping journals and ledgers to support the summaries were not diligently kept current on a regular basis. In sum, during processing of the claim, Dictiomatic never provided USF & G with consis-

tent, reliable information which might have supported its claim for loss of business income. The court finds that the Defendant USF & G acted timely and reasonably in reaching its decision in June, 1993, to deny Plaintiff's claim for this classification of contractual benefits under the policy.

*Conclusions of Law*

1. The insurance contract at issue between the parties states in pertinent part:

5. Business Income and Extra Expense.

a. Business Income. We will pay the actual loss of "business income" you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to Covered Property described in paragraph 1. above and result from any Covered Cause of Loss.

We will also pay for loss of "business income" sustained immediately after the "period of restoration" but not to exceed 30 consecutive days.

We will only pay for loss of "business income" that occurs within 12 consecutive months after the date of direct physical loss or damage.

C. Exclusions

\*        \*        \*        \*        \*        \*

2. We will not pay for loss or damages caused by or resulting from any of the following:

\*        \*        \*        \*        \*        \*

c. Consequential Loss. Delay, loss of use or loss of market.

\*        \*        \*        \*        \*        \*

Section V—Definitions

1. "Business income" means:

a. Net income (net profit or loss before income taxes) that would have been earned or incurred; and

b. Continuing normal operating expenses incurred, including payroll.

\*        \*        \*        \*        \*        \*

3. "Operations" means your business activities occurring at the described premises.

4. "Period of restoration" means the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the day the property at the described premises could be repaired, rebuilt or replaced with reasonable speed and similar quality.

■ 2. Under the terms of the policy, Dictiomatic is entitled to recover its actual loss of business income during the period of time necessary to restore the business operation. The insurance policy defines the period of restoration as beginning on the date of the direct physical damage to the business premises and ending on the date when the business premises should have been repaired, rebuilt or replaced with reasonable speed and similar quality. Therefore, Dictiomatic is only entitled to its loss of business income for the period of time beginning on the date of the occurrence of the physical damage to its property (August 24, 1992) and ending on the date when the business was back in operation (no later than September 14, 1992). *Manduca Datsun Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct.App.1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Hampton Foods, Inc. v. Aetna Casualty and Surety*, 787 F.2d 349 (8th Cir. 1986); *Goetz v. Hartford Fire Ins. Co.*, 193 Wis. 638, 215 N.W. 440 (1927); *Steel Products Co., Inc. v. Millers National Ins. Co.*, 209 N.W.2d 32 (Iowa 1973); *Congress Bar & Restaurant, Inc. v. Transamerica Ins. Co.*, 42 Wis.2d 56, 165 N.W.2d 409 (1968); *Dileo v. United States Fidelity & Guaranty Company*, 109 Ill.App.2d 28, 248 N.E.2d 669, 675 (1969). In light of the findings of fact and the language of the applicable contract, the court concludes as a matter of law that the period of restoration began on August 24, 1992, the date of the direct physical loss or damage caused by hurricane Andrew, and ended on September 14, 1992, the date on which Dictiomatic was back on the premises

and "up and running." Further, under the terms of the contract, the restoration period may be extended for a time up to 30 days if Dictiomatic proved that it actually sustained loss of business income as a result of the hurricane, during the time immediately after the period of restoration ended. Because Dictiomatic failed to establish loss of business income for any time immediately after September 14, 1992, the date it was again operational at its Miami office, the could concludes as a matter of law that the restoration period as defined in the contract should not be extended beyond September 14, 1992, the date the business was fully back in operation.

■ 3. To recover under the business interruption policy in this case, Dictiomatic must prove that it sustained damage to property that is covered under the policy and that the damage was caused by a covered cause of loss, that there was an interruption to the business ("suspension of operations") which was caused by the property damage, and that there was an actual loss of business income during the period of time necessary to restore the business and that the loss of income was caused by the interruption of the business and not by some other factor or factors. *Ramada Inn Ramogreen, Inc. v. Travelers Indemnity Co.*, 835 F.2d 812 (11th Cir.1988); *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct. of App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789 (1975). In the present case, Dictiomatic proved that it sustained property damage from hurricane Andrew, and that the damage caused suspension of operations for 20 days. However, Dictiomatic failed to prove that but/for the 20 day suspension of operations,

it sustained an actual loss of business income which was caused solely by the hurricane and not by other factors. The evidence establishes that the lack of sales resulted from factors other than the hurricane, or the damage therefrom.

4. If Dictiomatic either did not suffer a loss of business income during the period of interruption or if the loss was due to some reason other than the interruption, USF & G is not liable for business interruption proceeds under the insurance policy because its duty to pay never arose. *Ramada Inn Ramogreen, Inc. v. Travelers Indemnity Co.*, 835 F.2d 812 (11th Cir.1988); *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct. of App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789 (1975).

5. It is Dictiomatic's burden to prove Dictiomatic's entitlement to business interruption insurance proceeds under the insurance policy and the amount of such entitlement. *Royal Indemnity Co. v. Little Joe's Catfish, Inc.*, 636 S.W.2d 530 (Tex.App.1982); *Howard Stores Court v. Foremost Insurance Company*, 82 A.D.2d 398, 441 N.Y.S.2d 674 (S.Ct.App.Div.1981); *National Fire Ins. Co. of Hartford v. Hutton*, 396 S.W.2d 53 (Ky. 1965); *Cora Pub. Inc. v. Continental Casualty Co.*, 619 F.2d 482 (5th Cir.1980). Dictiomatic can recover only to the extent that it actually lost sales or business during the periods when the business premises and business property were not functioning. *Pennbarr Corp. v. INA*, 976 F.2d 145 (3rd Cir.1992); *Rogers v. American Ins. Co.*, 338 F.2d 240 (8th Cir.1964); *Boyd Motors, Inc. v. Employers Ins. of Wausau*, 880 F.2d 270 (10th Cir.); *Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins.*, 461 N.W.2d 496

(Minn.App.1990); *Howard Stores Corp. v. Foremost Ins. Co.*, 56 N.Y.S.2d 991, 453 N.Y.S.2d 682, 439 N.E.2d 397 (1982); *Rothenberg v. Liberty Mut. Ins. Co.*, 115 Ga.App. 26, 153 S.E.2d 447 (1967); *Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co.*, 9 Cal.App.3d 270, 88 Cal.Rptr. 122 (Cal. Ct.App.1970). Because the Plaintiff presented various, often inflated and contradictory projections of the amount due it under the insurance contract, the Plaintiff failed to prove that it actually lost sales or that it is entitled to a specific sum under the contract, either at trial or to USF & G while it was attempting to process the claim.

6. Business interruption insurance is intended to return to the insured's business the amount of profit it would have earned had there been no interruption of the business ("suspension of operations"). *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct.App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 227 N.W.2d 789 (1975). As one treatise summarizes, "Generally business interruption endorsements are designed to do for the insured what the business itself would have done had no interruption occurred and the interest protected is the right to income generated by an operating business enterprise. 4 Appleman Ins.L. and P. Section 2329. In this case, Dictiomatic failed to prove that but/for hurricane Andrew it would have realized business income which was lost solely as a result of the hurricane. Because Dictiomatic failed to establish that it would have enjoyed income during the time of restoration or immediately thereafter, sufficient to pay normal operating expenses or to generate profits, its claim for compensation un-

der the subject policy must fail as a matter of law.

■ 7. Business interruption insurance may not be used to put Dictiomatic in a better position than it would have occupied without the interruption. *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct. of App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789 (1975).

■ 8. In determining that Dictiomatic failed to prove the amount of the business interruption loss, this Court has considered the previous experience of Dictiomatic before the property damage occurred, as well as its probable future experience and finds that Dictiomatic's failure to prove an actual monetary loss as a result of the suspensions of operations due to hurricane Andrew constitutes a failure to prove a prerequisite to recovery on its business interruption claim. *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct.App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789 (1975).

9. The court finds that Dictiomatic suffered income losses throughout its entire period of operation immediately prior to the hurricane, and further that there is inade-

quate proof that Dictiomatic would have achieved profitability during the period of business interruption or immediately thereafter and further that Dictiomatic would have been unprofitable even without the business interruption. Accordingly, as a matter of law, Dictiomatic is not entitled to recover business interruption insurance proceeds under the insurance policy. *Supermarkets Operating Company v. Arkwright Mutual Ins. Co.*, 257 F.Supp. 273, 277 (E.Dist.Penn.1966); *Manduca Datsun, Inc. v. Universal Underwriters Ins. Co.*, 106 Idaho 163, 676 P.2d 1274 (Ct. of Appeal 1984); *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 282 Pa.Super. 207, 422 A.2d 1078 (1980); *Royal Indemnity Co. v. Little Joe's Catfish Inn, Inc.*, 636 S.W.2d 530 (Texas Ct.App.1982); *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966); *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Great Northern Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789 (1975).

■ 10. The subject contract of insurance does not pay for and specifically excludes loss or damage caused by or resulting from consequential loss, delay, loss of use, or loss of market. *Twin City Hide v. Transamerica Ins. Co.*, 358 N.W.2d 90 (Minn.Ct.App.1984); *Witcher Construction Company v. St. Paul Fire and Marine Ins. Co.*, 550 N.W.2d 1 (Ct.App.Minn.1996); *Blaine Richards & Co., Inc. v. Marine Indemnity Ins. Co. of America*, 635 F.2d 1051 (2d Cir.1980); *Boyd Motors, Inc. v. Employers Ins. of Wausau*, 880 F.2d 270 (10th Cir.1989); *Interpetrol Bermuda, Ltd., v. Lloyd's Underwriters*, 588 F.Supp. 1199 (S.D.N.Y.1984). Therefore, to the extent any loss claimed to be a loss of business income by Dictiomatic was not lost as a direct result of hurricane Andrew but rather as a consequence of any other reason, then such loss is excluded from coverage and there can be no recovery by Dictiomatic for such loss. *Rogers v. American Ins. Co.*, 338 F.2d 240 (8th Cir.1964); *Swedish Crucible Steel Co. v. Travelers Indemnity Co.*, 387 F.Supp. 231 (E.D.Mich.1974); *Pacific Coast Engineering Co. v. St. Paul Fire & Marine Ins. Co.*, 9 Cal.App.3d 270, 88 Cal.Rptr. 122 (Cal.Ct.App.1970); *Pennbarr Corp. v. INA,*

976 F.2d 145 (3rd Cir.1992); *Midland Broadcasters v. INA*, 636 F.Supp. 165 (D.Kan. 1986). The court finds that all alleged losses associated with the failure to produce and sell the T–3000 and the palm top computer, products that were not even in existence at the time of the hurricane, are merely potential consequential losses and are not, even if proved by a preponderance of the evidence, compensable under the subject insurance contract.

11. Because Dictiomatic's business interruption insurance claim is speculative, Dictiomatic cannot recover business interruption proceeds under the insurance policy. *Travelers Ins. Co. v. D & D Contracting*, 962 F.2d 971 (10th Cir.1992); *Hampton Foods, Inc. v. Aetna Casualty & Surety Co.*, 601 F.Supp. 58 (E.D.Mo.1984); *Fold–Pak Corp. v. Liberty Mut. Ins. Co.*, 784 F.Supp. 49 (W.D.N.Y., 1992).

12. Further, under the terms of the policy, Dictiomatic is entitled to recover only if it sustained an actual loss of "business income" defined as net income, either net profit or net loss, that Dictiomatic would have earned had the business not been interrupted, plus continuing normal operating expenses that were actually incurred during the interruption of business. If the amount of the net loss that would have been incurred had there been no business interruption exceeds the amount of normal operating expenses actually incurred, the resulting number is a negative number and there can be no recovery for an "actual loss of business income." *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Liberty Mutual Ins. Co. v. Sexton Foods Co., Inc.*, 42 Ark. App. 102, 854 S.W.2d 365 (Ct.App.1993); *Eisenson v. County Fire Ins. Co.*, 84 F.Supp. 41 (N.D.Fla.1949); *A & S Corporation v. Centennial Insurance Company*, 242 F.Supp. 584 (N.D.Ill.1965).

13. Dictiomatic has the burden of proving all the "continuing normal operating expenses incurred", as well as its expected income during the period of restoration. *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930 (Tenn.1992); *Liberty Mutual Ins. Co. v. Sexton Foods Co., Inc.*, 42 Ark. App. 102, 854 S.W.2d 365 (Ct.App.1993); *Eisenson v. County Fire Ins. Co.*, 84 F.Supp. 41 (N.D.Fla.1949); *A & S Corporation v. Centennial Insurance Company*, 242 F.Supp. 584 (N.D.Ill.1965).

14. The general law in Florida regarding recovery of anticipated profits was first stated by the Florida Supreme Court in *New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*, 122 Fla. 718, 166 So. 856 (1936). The general rule is that the anticipated profits of a business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss. *Diane Manufacturing Co. v. Sheffield Industries, Inc.*, 514 F.Supp. 185 (S.D.Fla.1981). There is an exception to the rule, however, to the effect that the loss of profit from the interruption of a business may be recovered where the Plaintiff makes it reasonably certain by competent proof what the amount of his actual loss was. *Id.* Proof of the income and of the expenses of the business for a reasonable time prior to the interruption is required. *Id.* Accordingly, in Florida a claim for lost profits must be shown with a reasonable degree of certainty. *Crain Automotive Group, Inc. v. J & M Graphics, Inc.*, 427 So.2d 300 (Fla. 3rd DCA 1983); *Beverage Canners, Inc. v. Cott Corporation*, 372 So.2d 954 (Fla. 3rd DCA 1979); *Royal Typewriter Company v. Xerographic Supplies Corporation*, 719 F.2d 1092 (11th Cir.1983). In this regard, a satisfactory analysis of lost profits cannot use figures which result in too many variables. *Royal Typewriter Company v. Xerographic Supplies Corporation*, 719 F.2d 1092 (11th Cir.1983); *Beverage Canners, Inc. v. Cott Corporation*, 372 So.2d 954 (Fla. 3rd DCA 1979). In the present case, Dictiomatic has not made it reasonably certain from competent proof that it would have realized profits from the sale of its products and, therefore, has not established that it was entitled to payment from USF & G for lost profits under the business interruption policy.

15. Analysis of lost profits must be based on sufficiently similar business operations and comparable markets. *Royal Typewriter Company v. Xerographic Supplies Corporation*, 719 F.2d 1092 (11th Cir. 1983); *Belcher v. Import Cars, Ltd.*, 246

606

So.2d 584 (Fla. 3rd DCA 1971); *TK–7 Corp. v. Barbouti,* 993 F.2d 722 (10th Cir.1993); *Trademark Research Corp. v. Maxwell On-line, Inc.,* 995 F.2d 326 (2d Cir.1993). In order to recover lost profits, there must be an on-going business with an established sales record and proven ability to realize profits at the established rate. *Daytona Migi of Jacksonville, Inc. v. Daytona Automotive Fiberglass, Inc.,* 388 So.2d 228 (Fla. 5th DCA 1980); *Conner v. Atlas Aircraft Corp.,* 310 So.2d 352 (Fla. DCA 1975); *Belcher v. Import Cars, Ltd.,* 246 So.2d 584 (Fla. 3d DCA 1971). Proof of actual profits for a reasonable time prior to the breach is required to establish lost profits. *Wash–Bowl, Inc. v. Wroton,* 432 So.2d 766 (Fla. 2d DCA 1983); *A & P Bakery Supply & Equipment v. Hawatmeh,* 388 So.2d 1071 (Fla. 3rd DCA 1980). In the present case, the history of successful sales of the Hexaglot T–427 and T–150 is not sufficient to establish Dictiomatic's lost profits from the T–1200, T–1500 or T–3000 products because the latter products were not sufficiently similar and did not attract a comparable market. Accordingly, the Plaintiff has failed to establish that for a reasonable time prior to hurricane Andrew Dictiomatic enjoyed profits from similar products in a similar market, thereby making it more likely than not that it would have realized profits from the next generations of products which were not similar to the earlier generations of products.

16. USF & G's duty to pay Dictiomatic's business interruption claim never arose because Dictiomatic never established the amount of such claim with credible, reliable or consistent testimony or documentation. USF & G could not have breached a contractual duty to pay which never arose. Accordingly, the court finds that the Plaintiff failed to establish its breach of contract claims against USF & G and further the court adjudicates that under the terms of the subject contract and the facts of this case, USF & G has no obligation to pay Dictiomatic's unsupported claim.

In view of all of the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED and ADJUDGED that the Plaintiff Dictiomatic's claims for Breach of Contract alleged in Counts I and II of the Complaint in Case No. 93–2123 be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 52(c) for failure of the Plaintiff to carry its burden of proof by a preponderance of the evidence. It is further

ORDERED and ADJUDGED that declaratory judgment in favor of the Plaintiff USF & G in Case No. 94–1692 be entered pursuant to 28 U.S.C. § 2201, declaring that under the terms of the applicable contract, USF & G had no duty to pay the business interruption claim presented to it by Dictiomatic Inc. for business income losses because Dictiomatic failed to establish that it sustained any unpaid covered losses under the insurance contract.

The Clerk of the court shall enter judgment in favor of USF & G in both consolidated cases and against Dictiomatic in accordance with this opinion.